S. Samuel Di Falco, S.
Laura Geer Kirkby died, a widow without issue, on November 15, 1963, domiciled in the County of Kent in England. Long prior thereto and while a resident of this State, she had executed a will on November 10, 1914 which has been admitted to probate in this court with letters of administration with the will annexed issuing to the Public Administrator who is here accounting. The dispositive provisions of that instrument were defeated by lapse through the prior deaths of all of the persons named to take as legatees and devisees and as a consequence intestacy results (Hard v. Ashley, 117 N. Y. 606; Matter of Costello, 147 Misc. 629; Matter of Leitiser, 125 N. Y. S. 2d 133).
Issue has been joined in this proceeding by persons asserting a status as distributees of the decedent on the paternal side. They severally filed answers objecting to the allegation in the petition that the testatrix died without known heirs; but it is a controversy between one group of objectants concerning the right of certain others to inherit because of the alleged illegitimacy of the ancestors through whom their relationship to the testatrix is traced which is at the base of the principal issue in dispute.
The claimants are in agreement that the law of England controls the distribution of the estate and they have satisfactorily established the fact that there are no persons related to the decedent on the maternal side who survived to share in the inheritance. The respondents are correct in their assertion regarding the controlling law for the deceased’s conceded domicile in England conclusively determines that question (EPTL 3-5.1, subd. [b], par. [2]; Matter of Gifford, 279 N. Y. 470). That being the case, all of the objectants, if related to the testatri through legitimate ancestors are on stirpital parity under the governing English statutes, as descendants in more or less remote degrees of her uncle and her aunt (Administration of Estates Act [1925], § 46, as amd. by Intestates’ Estates Act [1952], 15 & 16 Geo. VI & 1 Eliz. II, ch. 64; cf. 16 Halsbury’s Laws of England [3d ed.], Executors and Administrators, par. 780).
*985 If there is neither issue nor parent(s), relatives take as follows: (1) brothers and sisters of the whole blood and their issue; (2) brothers and sisters of the half blood and their, issue; (3) grandparent(s) in equal shares; (4) uncles and aunts being brothers and sisters of the whole blood of a parent and their issue-, (5) uncles and aunts being brothers and sisters of the half blood of a parent and their issue; (6) the Crown. (Intestates’ Estates Act, 15 & 16 Geo. VI & 1 Eliz. II, ch. 64; italics supplied.)
The testatrix was the only child born of the marriage of Albert Gibbs and Maria Thorne, both long since dead. No descendants on her mother’s side survive and the estate, as earlier noted, is presumably distributable among her paternal collaterals who are the issue of her uncle Luman Gibbs and of her aunt Lydia Gibbs. In the interest of clarity the individuals who comprise these two groups will be described collectively by the names of their respective ancestors. It is the position of the Luman claimants that Lydia’s only children, her two daughters, through whom the other objectants claim relationship to the testatrix, were both illegitimate, thus disqualifying all of her descendants from sharing in the estate. It was the proof brought forward to support the allegation of illegitimacy which formulated the issue for trial for the English authorities do in fact have the effect claimed for them by the Luman group and deny to Lydia’s progeny, if her daughters were illegitimate, the right to participate in any distribution. ‘ ‘ A bastard was incapable of transmitting heritable blood to his legitimate descendants so as to enable them to claim through him ” (3 Halsbury’s Laws of England [3d ed.], Bastardy and Legitimation, p. 104, par. 162, citing Birtwhistle v. Vardill, (7 Cl. & Fin. 895) where the rule is stated at page 937 (7 Eng. Rep. 1308, 1323): “ some stress appears to have been placed on the argument, that if B. had died before A. the intestate, leaving a child, such child might have inherited to A., tracing through his legitimate parent; and then it was asked if the child might inherit, why might not the parent himself inherit? But the answer to that supposed case appears to be that if the parent be not capable of inheriting himself, he has no heritable blood which he can transmit to his child; so that the child could not, under the assumed facts, have inherited ’ ’.
It may be observed in passing that the rule would be the same were the law of this jurisdiction to be applied in deciding the rights of inheritance (Matter of Thomann, 144 Misc. 497; Matter of Tomacelli-Filomarino, 189 Misc. 410; Matter of Slater, 195 Misc. 713; see, also, 87 ALR 2d 1274, 1281).
*986 In determining whether the deceased daughters of Lydia Gibbs were or were not legitimate, it is not the law of the domicile of the testatrix but, instead, the law of this jurisdiction of which they were residents, the so-called “ personal law ” of the persons directly involved, to which the court must resort (3 Halsbury’s Laws of England [3d ed.], Bastardy and Legitimation, pp. 86, 104; In re Bischoffsheim; Cassel v. Grant, [1948], ch. 79; [1947] 2 All E. R. 830; 87 ALR 2d 1274, 1281; Fourth Report of Temp. State Comm. on Modernization, Revision and Simplification of the Law of Estates; N. Y. Legis. Doc., 1965, No. 19, p. 233). It should be noted, however, that the enactment without retroactive effect of chapter 958 of the Laws of 1965 adding section 83-a to the Decedent Estate Law (now EPTL 4-1.2) substantially enlarging the rights of inheritance of illegitimates, has no force upon the facts of this case, for, as has been noted, the right to share, as distinguished from questions concerning the status of the individual claimants, is governed by the law of England.
Lydia Gibbs was born in Boyntonville, New York, in 1823 and died and was buried in that community, after a life-long residence, in 1910. Her first child, Jennie, was born there in 1846 but there is no official documentation of the birth or of a marriage of the mother for it was not until 1847, according to the testimony of the present Town Clerk and an archivist in the Library of the State of New York that the community commenced to maintain such records. Three years after Jennie’s birth Lydia’s second and only other child was born. Her birth certificate gives her surname as Gibbs, her mother’s maiden name, and in the space opposite the word “ father ” appears the entry ‘1 illegitimate ’ ’. Great reliance was placed upon this document by those who assail the claim of Lydia’s progeny and, in addition, they were able to assemble and present other material of an official or quasi-official nature which lends support to the assertion that Lydia never married and that her children were not lawful issue. Throughout her entire life, it was developed, she was known in the community as “ Lydia Gibbs ” and she was so named in the records of the Pittstown Methodist Church in the entries for the years 1880, 1883, 1885 and 1888, produced and identified by the present pastor. Similarly, census records in which her surname was uniformly given as that of her father rather than that of a husband were received in evidence as were also, a mortgage and documents of title recorded in the office of the Clerk of Rensselaer County in which without exception she was described as a party by her maiden name.
*987 Objection to the introduction in evidence of the documents to which reference has been made, particularly the Return of Births and the parish records, was noted and overruled for the reason that each of them was established by competent testimony to have been maintained in the regular course of record keeping and business and thus to be qualified for admission in accordance with the provisions of CPLR 4518 “ Business records.” An additional basis supporting the admissibility of the records to which the objections were addressed is to be found in the rule respecting an ancient document which has been said to “ prove itself ” upon a showing of its being more than 30 years old and having been kept for that time in proper custody i(Fairchild v. Union Ferry Co., 121 Misc. 513, affd. 212 App. Div. 823, affd. 240 N. Y. 666).
It is urged by the Lydia claimants that the doctrine of such cases as Matter of Strong (168 Misc. 716, affd. 256 App. Div. 971), Matter of Billings (196 Misc. 141), and Bilkovic v. Loeb (156 App. Div. 719), -precludes the reception in evidence of the Return of Births and other certificates coming within the purview of section 4103 of the Public Health Law, to prove or establish any of the information which they contain except the actual facts of death or birth. It is true that those and other cases may be said to stand for the proposition that the statute, which does state that such documents are prima facie evidence of all of the facts with which they are concerned, applies only to public rights and not to private controversies and so does not remove the hearsay impediment that prevents reliance upon the evidence of the collateral matters such as pedigree with which they deal. In none of the cases cited, however, was the effect of the business entry and ancient document rules upon the hearsay exclusion considered but it is the considered opinion of this court, in the light of other authorities, that where the conflict exists the former must prevail, solely with respect to the question of admissibility or nonadmissibility without regard to the weight to be given to the evidence of the matters sought to be proven. (See, for example, Duffy v. 42nd St. M. & S. N. Ave. Ry. Co., 266 App. Div. 865, where the court said: “We are of opinion that the trial court erred in limiting the evidentiary effect of the death certificate to the time and place of decedent’s death and excluding from the consideration of the jury that part of it showing the cause of the death of plaintiff’s intestate. (Civ. Prac. Act, § 374-a; People v. Kohlmeyer, 284 N. Y. 366; Meiselman v. Crown Hgts. Hosp., 285 N. Y. 389; Roberto v. Neilson, 262 App. Div. 1035, affd. 288 N. Y. 581.) ”; and, also, Pollack v. Metropolitan Life Ins. Co., 138 F. 2d 123; Bender’s New York Evidence, § 451.09.)
*988 A different basis for admission obtains with respect to the census records, which are subject to the operation of CPLR 4530 and are receivable when in the form prescribed in that section. Matters contained in these reports, other than the actual numerical facts, have been held to be entitled to consideration in evidence but again the question of the weight to be afforded them, as is true in the case of many other documents and records of an official nature (cf. Matter of Jussila, 9 Misc 2d 4), is reserved for determination by the court (Matter of Kennedy, 82 Misc. 214 [family relationship]; Matter of Meserole, 132 Misc. 259 [age]; Matter of Wood, 170 Misc. 877 [pedigree facts]).
A separate and significant addition to the record in support of the position of the Luman Gribbs objectants was the inscription on the tombstone of Lydia where she was once more identified only by her maiden name. This was also true of her death certificate. She was so described as well in probate and accounting proceedings in the Surrogate’s Court of Rensselaer County concerned with the administration of the estates of her uncle and her sister. When it is read against the failure of even a semblance of an attempt to establish by testimonial or documentary evidence a ceremonial or common-law marital relationship with the father of her two daughters, the body of proof described casts most serious doubt upon the presumption that Lydia’s issue were legitimate.
If the presumption, which the cases describe almost automatically as one of the strongest known to the law (Commissioner of Public Welfare, v. Koehler, 284 N. Y. 260), cannot be said to prevail against the evidence brought forward to rebut it, then the Lydia objectants must fail in their assertion of status in this estate, for they have produced little or nothing of significance in the way of proof to support their position. The marriage and death certificates of Lydia’s daughters identify their father variously as “ Jesse Slauson ” or “ John Slawson ” and the marriage and death certificates of their children list the maiden names of the mother as “Slauson” or “Slawson”. These documents, like those offered to rebut them, were received in evidence despite the rule in Billings and Strong (supra), for the reasons described earlier but their probative effectiveness is considerably weakened by the fact that in point of time they follow long after the births of the persons whose legitimacy is in question and thus unavoidably appear to bear the earmarks of afterthought. For was the testimonial proof.of greater weight; one of the claimants, a grandson of Lydia, testified that he had known her *989 and in fact had lived in the same house for a time with her and her father but he made no attempt to prove a marital relationship and acknowledged that he had served her with citation as ‘1 Lydia Gibbs ’ ’ in one of the estate proceedings to which reference has earlier been made.
In the view of the court the presumption of legitimacy cannot sustain the burden cast upon it by the facts of record in this case. During the period in which she lived, in the tiny community in which she resided and in the family of which she was a member, no logical explanation can be found to explain her failure to assume the name of her husband if in fact she had ever married. The only inference available as an alternative in light of the record is that she never did enter into a marital relationship with the father of her daughters who was, so far as appears here, the ephemeral, offstage “ Slauson-Slawson ”. Accordingly, the claimants, the legitimate issue of her daughters, who, in their own right became respected and in some instances leading members of the communities in which they resided, are nevertheless barred from the inheritance under the rules discussed earlier and their objections are dismissed (Matter of Findlay, 253 N. Y. 1; Matter of Opperman, 115 N. Y. S. 2d 503; Matter of Simpson, 175 Misc. 718, affd. 262 App. Div. 1001; Matter of Nones, 115 N. Y. S. 2d 830, affd. 278 App. Div. 924). Particularly relevant to the problem confronting the court in this case is the comment, typically cogent, of Mr. Surrogate Folsy in Simpson (supra) where he said at pages 722-723: u the presumption of legitimacy of the mother of the contestant has been riddled to the point of destruction by the array of facts in evidence. To apply it would be a mere sanctimonious pretense. 1 There are breaths of human nature at which presumptions shrink and wither.’ (Matter of Findlay, supra.) The disposition of the courts, and particularly of the surrogates, is to save children from the brand of illegitimacy. On the other hand, where the fact of illegitimacy is revealed, the recognition of the rights of legitimate relations under statutory requirements may not be unjustly perverted by any sentimental consideration. (Matter of Bruington, 160 Misc. 34, 38; Dieterich v. Dieterich, 154 id. 714.) Presumptions may be looked upon ‘ as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts.’ (Mockowik v. Kansas City, St. Joseph & Council Bluffs R. R. Co., 196 Mo. 550; 94 S. W. 256.) They ‘ are indulged to supply the place of facts; they are never allowed against ascertained and established facts. When these appear, presumptions disappear. ’ (Lincoln v. French, 105 U. S. 614.) ”
*990 With distribution under this decision confined to the issue of Luman Gibbs, we reach a secondary question framed by the objections interposed by Gertrude Emmet and Leo Gibbs, his only living children. Among the assets with which the testatrix dealt in her will was a parcel of New York real estate but, subsequent to the execution of that instrument, she was adjudicated an incompetent in a proceeding instituted in the Supreme Court of this State and for the balance of her life her affairs were administered by her committee which, with the approval of the court, sold the property in question. It is the position of Mrs. Emmet and her brother that the sale by the committee did not work an ademption of the gift and that its proceeds now in the hands of the accounting fiduciary are distributable to them as realty under the laws of the State of New York to the exclusion of the children of their deceased brother who qualify as persons entitled to share in the estate but only to the extent that the English law may be said to be controlling (Halsbury’s Laws of England, op. cit.).
Had title to the property remained in the testatrix up until her death, its passage under her will or to her distributees would unquestionably be governed by the law of this State (Matter of Del Drago, 287 N. Y. 61, revd. on other grounds sub nom. Riggs v. Del Drago, 317 U. S. 95; EPTL 3-5.1, subd. [b], par. [1]). Furthermore, at the time of the death of the testatrix, and for a period commencing many years prior thereto, it had uniformly been held under statutory authority that a sale by the committee of an incompetent of real property located in this State which he had previously disposed of by will did not work an ademption of the subject matter of the devise and the proceeds continued to be “ deemed property of the same nature as the estate or interest sold until * * * the incompetency is removed ” (Civ. Prac. Act, § 1399, formerly Code Civ. Pro., § 2359; see, also, Decedent Estate Law, § 36, now EPTL 3-4.4, and Real Property Actions and Proceedings Law, § 1755; Matter of Hubbard, 196 Misc. 224). In this context and upon the authority of the statutes cited it is not material that the devise of the property failed because of the death of the devisee prior to that of the testatrix or that intestacy has been decreed. It is the subject matter of the gift and not the identity of the person or persons named to take with which the Legislature dealt and the cases spoke, and, as a result, only those persons who qualify as distributees under the law of this State are entitled to share in the proceeds of the sale by the committee (Matter of Hubbard, 196 Misc. 224,. supra, in *991 which the court notes, coincidentally, that the same result would obtain under English law).
Submit decree on notice settling the account in accordance with the rulings here made and directing that the proceeds of the sale of the New York realty are to be divided equally between Mrs. Gertrude Emmet and Mr. Leo Gibbs, with the balance of the distributable estate passing to them in shares of one third each and to William Luman and John Lansing Gibbs, the only children of their deceased brother, William Seymour Gibbs, in equal shares of one sixth.